UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FEDERAL EXPRESS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. LINDELL,<br><br>Defendant. | **Case No. 25-cv-10053**<br><br>**DECLARATION OF MICHAEL J. LINDELL** |

STATE OF MINNESOTA )
)ss.
COUNTY OF CARVER )

I, Michael J. Lindell, state as follows:

1. I am named as a defendant in this matter. I am the Chief Executive Officer of defendant My Pillow, Inc. ("My Pillow"). I submit this declaration in opposition to Plaintiff's motion for summary judgment. This declaration is based upon my own personal knowledge.

2. For years, My Pillow relied on Plaintiff Federal Express Corporation "FedEx" to ship My Pillow products to customers. For years, My Pillow paid millions of dollars to FedEx on a timely basis.

3. Beginning in mid-2022, My Pillow began suffering a string of what were at that point in time inexplicable financial reversals, which have recently been revealed to be triggered as a result of Operation Arctic Frost, which had targeted My Pillow.

4. For example, My Pillow's merchant server imposed a new, $5,000,000.00 hold on the funds in My Pillow's account, which forced My Pillow to find another merchant server.

5. Fox News dropped all of My Pillow's advertising based on an alleged payment dispute. But Fox News dropped My Pillow even though at that point in time, My Pillow only

owed an amount that was within My Pillow's then-credit limit with Fox News. Fox News also decreased the window of time in which My Pillow was required to pay for advertising, from twelve down to eight weeks.

6. In June of 2022, Walmart, which was at that time My Pillow's biggest retailer, removed all of My Pillow products from its physical stores. I believe that Walmart's actions made no economic sense because at that point in time, My Pillow was one of Walmart's top selling products of all time.

7. I have also now learned that My Pillow's bank was subpoenaed for My Pillow financial records in the context of Arctic Frost and as a result, My Pillow's bank terminated its relationship with My Pillow.

8. During this time, American Express also slashed My Pillow's credit line by 90%, decreasing it from $1,000,000.00 to $100,000.00 without warning and demanded payment within 24 hours. American Express took these steps despite the fact that My Pillow had never been late on its payments before and the amount then owed to American Express was within My Pillow's credit limit and terms.

9. When faced with these financial setbacks, I sought various options to keep My Pillow in business and pay its bills, vendors, and employees.

10. During this time, I was texting and speaking with FedEx about My Pillow almost daily. During these regular calls and texts exchanges with FedEx, I mentioned various ways in which My Pillow was hoping to obtain funds. I openly discussed the current status of those potential, future financial alternatives with FedEx and also indicated to FedEx that those financial alternatives were in the control of other, third parties and not My Pillow or me.

11. Even though I was in regular contact with FedEx personnel during the period of time before FedEx sued, during these numerous communications, both in telephone calls and texts, I was never informed about this lawsuit, any of the filings in the lawsuit, or the Court's entry of the default and then the default judgment against My Pillow and me.

12. I have come to learn that FedEx claims it served its initial Complaint on an employee of My Pillow, Joe Schmieg. Schmieg holds the title of vice president of sales. In that role, however, he is not an executive officer of My Pillow because he has never been elected by My Pillow's Board of Directors as is required by My Pillow's by-laws in order to be a corporate executive. Schmieg has never had any executive responsibilities, he makes no strategic decisions, and he is not and has never been authorized to accept service on behalf of My Pillow.

13. I was never informed about this attempted service and never saw the initial Complaint at that point in time, only learning about it after default judgment had been entered against My Pillow and me and FedEx began to try and collect on the default judgments.

14. In June of 2025, someone handed me what FedEx claims was its First Amended Complaint in this case. At that time, I was in Colorado in the midst of a contentious federal jury trial. When the person approached me, I was out in the courthouse hallway during a several minute break. I was one of the defendants in that trial and the plaintiff was seeking millions of dollars from another defendant and me. I was focused solely on that ongoing federal jury trial. I barely registered that someone had handed me documents. I believed that the encounter was either related to the Colorado trial or a maneuver by the media personnel, who were closely following the jury trial. I do not know what happened to the documents, which I never read because I was in the midst of the trial and I immediately returned to the courtroom and continued to focus on those proceedings.

15. Neither My Pillow nor I ever received any other documents, notifications, or court filings in this matter. Even though FedEx attested that its motion for default judgment was mailed to My Pillow and me, to my knowledge these documents were never received. In addition, My Pillow and I never received a copy of the Court's Order granting FedEx's motion for default judgment until after FedEx began its collection activities.

16. My Pillow and I were never aware of the FedEx lawsuit until after the default judgments had been entered in favor of FedEx and FedEx started its collection activities even though I was in almost constant contact with FedEx during that period of time. My Pillow and I would have responded timely if we had been aware of the pending default and subsequent default judgment; we were not.

17. I understand that FedEx alleges that I knew I was making false statements about various potential financial options when I mentioned them to FedEx. That is not true. At the time I made various statements to FedEx I in good faith believed them to be true. In addition, I made sure that FedEx understood during these communications that I was relying on third parties to keep their word to me or go through with the actions they had promised me. For example, I understand that FedEx claims that I was making statements that I then knew to be false about an IPO involving FrankSpeech. That is not the case. I had no control over the ultimate success of that IPO, which was not as successful as others had promised me. And I never received any funds as a result on this IPO. FedEx also takes issue with my discussions about what it calls a stock option opportunity as well as potential loans I was trying to obtain. At the time I discussed these various potential opportunities with FedEx, I believed all of the statements I made were true. I also had no control over these potential financial alternatives and the stock option opportunity and the loans third parties were promising did not materialize. Furthermore, Arctic

Frost I now know precluded My Pillow or me from obtaining loans or accessing other financial opportunities, including those I discussed with FedEx.

18. FedEx charged My Pillow approximately $1,300,000.00 in late fees even though My Pillow was paying timely. It took more than a year to get even a partial credit for those late fees. My Pillow has never recovered about $500,000.00 of those improper late fees. FedEx's delay in providing credit for those late fees had an extraordinarily damaging financial impact on My Pillow during a time when My Pillow, as I now have learned, was under attack by Arctic Frost. In addition, FedEx unilaterally and without justification changed the material terms of the parties' arrangement by, among other things, decreasing the number of days for the due date of My Pillow's payments from 60 days, to 45 days, to 30 days, even though My Pillow was still paying, and at the same time, FedEx increased the amount of the late fees that it would charge for allegedly late payments. FedEx even began to refuse to allow My Pillow to pay cash for shipping.

19. I am a resident of Minnesota. I have never been a resident of New York.

20. I have no contacts with New York that relate to FedEx.

21. I was never in New York when I had dealings with FedEx. I was principally in Minnesota during all of my interactions with FedEx.

22. It is my understanding that no one with whom I dealt at FedEx was a New York resident or otherwise located in New York.

23. There were no documents with FedEx that would have been executed by me in New York.

24. My Pillow is an employee-owned company. Although I own shares, I am not the "owner."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 12, 2026. s/Michael J. Lindell