UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL EXPRESS CORPORATION,

Plaintiff,

v.

MICHAEL J. LINDELL,

Defendant.

**Case No. 25-cv-10053**

**DEFENDANT'S RESPONSES TO PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND COUNTERSTATEMENT OF MATERIAL FACTS**

Defendant Michael J. Lindell ("Defendant"), by and through his undersigned counsel, submits this Response to the Statement of Undisputed Material Facts of Plaintiff Federal Express Corporation ("Plaintiff"), pursuant to Local Civil Rule 56.1. Reference is made herein to the Declarations of Michael J. Lindell ("Lindell Dec."), Jeremiah Pilon ("Pilon Dec.") and Joe Schmieg ("Schmieg Dec."), and to the exhibits attached thereto.

1. In February 2021, FedEx and MP Distribution, LLC (the predecessor of My Pillow, Inc. ("My Pillow")) entered into a Transportation Services Agreement (the "Contract"). Puszko Affirmation, at ¶ 2.1.

**RESPONSE:** Deny.

2. After My Pillow stopped making payments to FedEx in accordance with the Contract, on February 27, 2025, FedEx filed a complaint (the "Original Complaint") against My Pillow in the United States District Court for the Western District of Tennessee, Western Division.

**RESPONSE:** Defendant objects to this statement to the extent it contains legal conclusions, rather than assertions of fact. Subject to the foregoing objection, admitted that there came a time when My Pillow stopped making payments to FedEx, and admitted that there came

a time when FedEx filed the Original Complaint, but denied that My Pillow's actions were unjustified, as FedEx materially breached the terms of the Contract by improperly charging more than $1,300,000.00 in late fees, which caused significant financial damage to My Pillow. Lindell Dec. ¶ 18.

3. My Pillow was served with the Original Complaint on March 4, 2025. *See* Docket No. 12 (W.D. Tenn. Case 2:25-cv-02222-JPM-atc).

**RESPONSE:** Denied. Lindell Dec. ¶¶ 12-13.

4. On June 6, 2025, FedEx filed a First Amended Complaint (the "First Amended Complaint") against both My Pillow and Michael J. Lindell ("Lindell') (the owner of My Pillow), now adding a fraud claim against Lindell based on representations Lindell made to FedEx to allow My Pillow to continue shipping on credit. *See* Docket No. 13 (W.D. Tenn. Case 2:25-cv-02222-JPM-atc).

**RESPONSE:** Admitted that FedEx filed a First Amended Complaint, but denied that Lindell defrauded or made false representations to FedEx, and denied that Lindell is the owner of My Pillow. Lindell Dec. ¶¶ 17, 24.

5. On the same day, both Lindell and My Pillow were served with the First Amended Complaint. *See* Docket No. 15, 16 (W.D. Tenn. Case 2:25-cv-02222-JPM-atc).

**RESPONSE:** Denied. Lindell Dec. ¶¶ 14-15.

6. After neither Lindell nor My Pillow responded to or otherwise answered the Original Complaint or the First Amended Complaint despite their deadlines to do so, on July 7, 2025, FedEx requested that the Clerk enter default as to both defendants so that FedEx could proceed with a Motion for Default Judgment to establish the damages to be awarded as to each defendant. *See* Docket No. 17 (W.D. Tenn. Case 2:25-cv-02222-JPM-atc).

**RESPONSE:** Admitted that neither Lindell nor My Pillow responded to the Original Complaint or First Amended Complaint, and admitted that FedEx requested that the Clerk enter default against Lindell and My Pillow, but denied that Lindell or My Pillow were in default, and denied that FedEx's request for entry of default was proper. Lindell Dec. ¶¶ 11, 13, 15-16.

7. The clerk entered a default against Lindell and My Pillow on July 8, 2025. *See* Docket No. 18 (W.D. Tenn. Case 2:25-cv-02222-JPM-atc).

**RESPONSE:** Admitted that the clerk entered a default against Lindell and My Pillow, but denied that Lindell or My Pillow were in default, and denied that the clerk's entry of default was proper. Lindell Dec. ¶¶ 11, 13, 15-16.

8. On July 10, 2025, FedEx filed a Motion for Entry of Default Judgment against Lindell and My Pillow. *See* Docket No. 19 (W.D. Tenn. Case 2:25-cv-02222-JPM-atc).

**RESPONSE:** Admitted that FedEx filed a Motion for Entry of Default Judgment against Lindell and My Pillow, but denied that Lindell or My Pillow were in default, and denied that FedEx's motion was proper. Lindell Dec. ¶¶ 11, 13, 15-16.

9. On August 1, 2025, the United States District Court for the Western District of Tennessee, Western Division, entered an Order Granting Motion for Entry of Default Judgment, finding My Pillow liable to FedEx in the amount of $8,809,056.31 in compensatory damages and finding Lindell jointly and severally liable to FedEx in the amount of $2,677,933.31 in compensatory damages (the "Tennessee Judgment"). *See* Docket No. 24, 25 (W.D. Tenn. Case 2:25-cv-02222-JPM-atc).

**RESPONSE:** Admitted that the Tennessee Judgment was entered, but denied that Lindell or My Pillow were in default, and denied that the Tennessee Judgment was proper. Lindell Dec. ¶¶ 11, 13, 15-16.

10. The Court additionally awarded court costs and post-judgment interest. Lindell Dec. ¶¶ 11, 13, 15-16.

**RESPONSE:** Admitted that the Tennessee Judgment was entered, but denied that Lindell or My Pillow were in default, and denied that the Tennessee Judgment was proper. Lindell Dec. ¶¶ 11, 13, 15-16.

11. The deadline for Lindell to appeal the Tennessee Judgment was September 1, 2025. Fed. R. App. P. 4(a)(1)(A).

**RESPONSE:** Admitted that, were the Tennessee Judgment proper, the deadline for Lindell to appeal would have been September 1, 2025, but denied that Lindell or My Pillow were in default, and denied that the Tennessee Judgment was proper. Lindell Dec. ¶¶ 11, 13, 15-16.

12. Lindell did not appeal the Tennessee Judgment. *See generally*, W.D. Tenn. Case2:25-cv-02222-JPM-atc.

**RESPONSE:** Admitted, but denied that Lindell or My Pillow were in default, and denied that the Tennessee Judgment was proper. Lindell Dec. ¶¶ 11, 13, 15-16.

13. FedEx has not received any amount owed to it pursuant to the Tennessee Judgment. Puszko Affirmation, at ¶17; Bernhardt Affirmation, at ¶ 10.

**RESPONSE:** Admitted that Lindell has not made any payments to FedEx in connection with the Tennessee Judgment, but denied that Lindell or My Pillow were in default, and denied that the Tennessee Judgment was proper. Lindell Dec. ¶¶ 11, 13, 15-16.

14. On October 17, 2025, FedEx filed a Motion for Summary Judgment in Lieu of Complaint against Lindell pursuant to New York Civil Practice Law and Rules ("CPLR") 3213 in the Supreme Court of the State of New York, County of New York, requesting that a judgment be entered in favor of FedEx in an amount equal to $2,677,933.31, along with

prejudgment and post-judgment interest, all fees and expenses (including costs of suit and attorneys' fees), and such other and further relief as the Court deems just and proper (the "State Court Summary Judgment Action"). NYSCEF Doc. No. 2 (N.Y. Sup. Ct., N.Y. Cnty., Index No. 659206/2025).

**RESPONSE:** Admitted, but denied that the filing by FedEx was proper or that the judgment in Tennessee was proper. Lindell Dec. ¶¶ 11, 13, 15-16; Berens Dec. Ex. J.

15. On or about December 2, 2025, Lindell was served with the State Court Summary Judgment Action. Docket No. 4.

**RESPONSE:** Admitted, but denied that the filing by FedEx was proper. Lindell Dec. ¶¶ 11, 13, 15-16; Berens Dec. Ex. J.

16. On December 3, 2025, Lindell removed the State Court Summary Judgment Action to this Court. NYSCEF Doc. No. 8 (N.Y. Sup. Ct., N.Y. Cnty., Index No. 659206/2025).

**RESPONSE:** Admitted.

17. On March 18, 2026, this Court entered an Order requiring FedEx to file a complaint and motion for summary judgment by March 31, 2026. Docket No. 7.

**RESPONSE:** Admitted.

## DEFENDANTS' COUNTERSTATEMENT OF ADDITIONAL FACTS

1. Michael J. Lindell ("Lindell") is the Chief Executive Officer of defendant My Pillow, Inc. ("My Pillow"). Lindell Dec. ¶ 1.

2. For years, My Pillow relied on Plaintiff Federal Express Corporation "FedEx" to ship My Pillow products to customers. Lindell Dec. ¶ 1.

3. For years, My Pillow paid millions of dollars to FedEx on a timely basis. Lindell

Dec. ¶ 1.

4. Beginning in mid-2022, My Pillow began suffering a string of what were at that point in time inexplicable financial reversals, which have recently been revealed to be triggered as a result of Operation Arctic Frost, which had targeted My Pillow. Lindell Dec. ¶ 3; Berens Dec. Exs. A, C, G.

5. For example, My Pillow's merchant server imposed a new, $5,000,000.00 hold on the funds in My Pillow's account, which forced My Pillow to find another merchant server. Lindell Dec. ¶ 4.

6. Fox News dropped all of My Pillow's advertising based on an alleged payment dispute. Lindell Dec. ¶ 5; Berens Dec. Ex. E.

7. But Fox News dropped My Pillow even though at that point in time, My Pillow only owed an amount that was within My Pillow's then-credit limit with Fox News. Lindell Dec. ¶ 5; Berens Dec. Ex. E.

8. Fox News also decreased the window of time in which My Pillow was required to pay for advertising, from twelve down to eight weeks. Lindell Dec. ¶ 5; Berens Dec. Ex. E.

9. In June of 2022, Walmart, which was at that time My Pillow's biggest retailer, removed all of My Pillow products from its physical stores. Lindell Dec. ¶ 6; Berens Dec. Ex. B.

10. Lindell believes that Walmart's actions made no economic sense because at that point in time, My Pillow was one of Walmart's top selling products of all time. Lindell Dec. ¶ 6; Berens Dec. Ex. B.

11. My Pillow's bank was subpoenaed for My Pillow financial records in the context of Arctic Frost and as a result, My Pillow's bank terminated its relationship with My Pillow. Lindell Dec. ¶ 7; Berens Dec. Ex. C.

12. During this time, American Express also slashed My Pillow's credit line by 90%, decreasing it from $1,000,000.00 to $100,000.00 without warning and demanded payment within 24 hours. Lindell Dec. ¶ 8; Berens Dec. Ex. D.

13. American Express took these steps despite the fact that My Pillow had never been late on its payments before and the amount then owed to American Express was within My Pillow's credit limit and terms. Lindell Dec. ¶ 8; Berens Dec. Ex. D.

14. When faced with these financial setbacks, Lindell sought various options to keep My Pillow in business and pay its bills, vendors, and employees. Lindell Dec. ¶ 9; Berens Dec. Ex. F.

15. During this time, Lindell was texting and speaking with FedEx about My Pillow almost daily. Lindell Dec. ¶ 10.

16. During these regular calls and texts exchanges with FedEx, Lindell mentioned various ways in which My Pillow was hoping to obtain funds. Lindell Dec. ¶ 10.

17. Lindell openly discussed the current status of those potential, future financial alternatives with FedEx and also indicated to FedEx that those financial alternatives were in the control of other, third parties and not My Pillow or Lindell. Lindell Dec. ¶ 10; Berens Dec. Ex. F.

18. Even though Lindell was in regular contact with FedEx personnel during the period of time before FedEx sued, during these numerous communications, both in telephone calls and texts, Lindell was never informed about FedEx's lawsuit against My Pillow and Lindell in Tennessee, any of the filings in the lawsuit, or the Court's entry of the default and then the default judgment against My Pillow and Lindell. Lindell Dec. ¶ 11.

19. FedEx claims it served its initial Complaint on an employee of My Pillow, Joe

Schmieg. Lindell Dec. ¶ 12; Schmeig Dec. ¶ 2; Pilon Dec. ¶ 3.

20. Schmieg holds the title of vice president of sales. Lindell Dec. ¶ 12; Schmeig Dec. ¶ 2; Pilon Dec. ¶ 3.

21. In that role, however, Schmieg is not an executive officer of My Pillow because he has never been elected by My Pillow's Board of Directors as is required by My Pillow's by-laws in order to be a corporate executive. Lindell Dec. ¶ 12; Schmeig Dec. ¶ 2; Pilon Dec. ¶ 3.

22. Schmieg has never had any executive responsibilities, he makes no strategic decisions, and he is not and has never been authorized to accept service on behalf of My Pillow. Lindell Dec. ¶ 12; Schmieg Dec. ¶ 2; Pilon Dec. ¶ 3.

23. Schmieg is not and has never been authorized to sign for any court or other legal documents on behalf of My Pillow. Lindell Dec. ¶ 12; Schmieg Dec. ¶ 3.

24. Lindell was never informed about this attempted service and never saw the initial Complaint at that point in time, only learning about it after default judgment had been entered against My Pillow and Lindell and FedEx began to try and collect on the default judgments. Lindell Dec. ¶ 13.

25. In June of 2025, someone handed Lindell what FedEx claims was its First Amended Complaint in this case. Lindell Dec. ¶ 14.

26. At that time, Lindell was in Colorado in the midst of a contentious federal jury trial. Lindell Dec. ¶ 14.

27. When the person approached Lindell, Lindell was out in the courthouse hallway during a several minute break. Lindell Dec. ¶ 14.

28. Lindell was one of the defendants in that trial and the plaintiff was seeking millions of dollars from another defendant and Lindell. Lindell Dec. ¶ 14.

29. Lindell was focused solely on that ongoing federal jury trial. Lindell Dec. ¶ 14.

30. Lindell barely registered that someone had handed him documents. Lindell Dec. ¶ 14.

31. Lindell believed that the encounter was either related to the Colorado trial or a maneuver by the media personnel, who were closely following the jury trial. Lindell Dec. ¶ 14.

32. Lindell does not know what happened to the documents, which Lindell never read because he was in the midst of the trial and he immediately returned to the courtroom and continued to focus on those proceedings. Lindell Dec. ¶ 14.

33. Neither My Pillow nor Lindell ever received any other documents, notifications, or court filings in the Tennessee matter. Lindell Dec. ¶ 15.

34. Even though FedEx attested that its motion for default judgment was mailed to My Pillow and Lindell, those documents were never received. Lindell Dec. ¶ 15; Pilon Dec. ¶ 5.

35. My Pillow and Lindell never received a copy of the Court's Order granting FedEx's motion for default judgment until after FedEx began its collection activities. Lindell Dec. ¶ 15; Pilon Dec. ¶ 5.

36. My Pillow and Lindell were never aware of the FedEx lawsuit until after the default judgments had been entered in favor of FedEx and FedEx started its collection activities even though Lindell was in almost constant contact with FedEx during that period of time. Lindell Dec. ¶ 16; Pilon Dec. ¶¶ 2, 4.

37. My Pillow and Lindell would have responded timely if they had been aware of the pending default and subsequent default judgment; they were not. Lindell Dec. ¶ 16; Pilon Dec. ¶ 6.

38. Lindell understands that FedEx alleges that Lindell knew he was making false

statements about various potential financial options when Lindell mentioned them to FedEx. That is not true. Lindell Dec. ¶ 17.

39. At the time Lindell made various statements to FedEx, Lindell in good faith believed them to be true. Lindell Dec. ¶ 17.

40. In addition, Lindell made sure that FedEx understood during these communications that Lindell was relying on third parties to keep their word to Lindell or go through with the actions they had promised Lindell. Lindell Dec. ¶ 17.

41. For example, Lindell understand that FedEx claims that he was making statements that he then knew to be false about an IPO involving FrankSpeech. That is not the case. Lindell Dec. ¶ 17.

42. Lindell had no control over the ultimate success of that IPO, which was not as successful as others had promised Lindell. Lindell Dec. ¶ 17.

43. Lindell never received any funds as a result on this IPO. Lindell Dec. ¶ 17.

44. FedEx also takes issue with Lindell's discussions about what it calls a stock option opportunity as well as potential loans Lindell was trying to obtain. Lindell Dec. ¶ 17.

45. At the time Lindell discussed these various potential opportunities with FedEx, Lindell believed all of the statements he made were true. Lindell Dec. ¶ 17.

46. Lindell also had no control over these potential financial alternatives and the stock option opportunity and the loans third parties were promising did not materialize. Lindell Dec. ¶ 17.

47. Furthermore, Arctic Frost, Lindell now knows, precluded My Pillow or Lindell from obtaining loans or accessing other financial opportunities, including those Lindell discussed with FedEx. Lindell Dec. ¶ 17.

48. FedEx charged My Pillow approximately $1,300,000.00 in late fees even though My Pillow was paying timely. Lindell Dec. ¶ 18.

49. It took more than a year to get even a partial credit for those late fees. Lindell Dec. ¶ 18.

50. My Pillow has never recovered about $500,000.00 of those improper late fees. Lindell Dec. ¶ 18.

51. FedEx's delay in providing credit for those late fees had an extraordinarily damaging financial impact on My Pillow during a time when My Pillow, as Lindell now has learned, was under attack by Arctic Frost. Lindell Dec. ¶ 18.

52. In addition, FedEx unilaterally and without justification changed the material terms of the parties' arrangement by, among other things, decreasing the number of days for the due date of My Pillow's payments from 60 days, to 45 days, to 30 days, even though My Pillow was still paying, and at the same time, FedEx increased the amount of the late fees that it would charge for allegedly late payments. Lindell Dec. ¶ 18.

53. FedEx even began to refuse to allow My Pillow to pay cash for shipping. Lindell Dec. ¶ 18.

54. Lindell is a resident of Minnesota. Lindell Dec. ¶ 19.

55. Lindell has never been a resident of New York. Lindell Dec. ¶ 19.

56. Lindell has no contacts with New York that relate to FedEx. Lindell Dec. ¶ 20.

57. Lindell was never in New York when he had dealings with FedEx. Lindell Dec. ¶ 21.

58. Lindell was principally in Minnesota during all of his interactions with FedEx. Lindell Dec. ¶ 21

59. No one with whom Lindell dealt at FedEx was a New York resident or otherwise located in New York. Lindell Dec. ¶ 22.

60. There were no documents with FedEx that were executed by Lindell in New York. Lindell Dec. ¶ 23.

61. My Pillow is an employee-owned company. Lindell Dec. ¶ 24.

62. Although Lindell owns shares of My Pillow, he is not the “owner.” Lindell Dec. ¶ 24.

63. On February 27, 2025, FedEx filed a complaint (the “Original Complaint”) against My Pillow in the United States District Court for the Western District of Tennessee, Western Division. Berens Dec. ¶ 9 & Ex. H.

64. On June 6, 2025, FedEx filed a First Amended Complaint (the “First Amended Complaint”) against both My Pillow and Lindell. Berens Dec. ¶ 10 & Ex. I.

65. On May 12, 2026, Defendant moved to vacate the default judgment against him secured by FedEx in Tennessee. Berens Dec. ¶ 11 & Ex. J.

Dated: New York, New York
May 12, 2026

PARNESS LAW FIRM, PLLC

By: /s/ Hillel I. Parness
Hillel I. Parness
136 Madison Ave., 6th Floor
New York, New York 10016
(212) 447-5299
hip@hiplaw.com
*Attorneys for Defendant Michael Lindell*